**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2524
_____

DAVID ROTH; BETSY ROTH,
                                        Appellants
v.

NORFALCO LLC

On Appeal from the United States District Court
for the Middle District of Pennsylvania
District Court  No. 1-06-cv-01452
District Judge: The Honorable Yvette Kane

Argued March 24, 2011

Before: FUENTES, SMITH, and GREENBERG,
*Circuit Judges*

(Filed:  June 28, 2011)

Albert J. Evans (argued)
Riley & Fanelli P.C.
1 Mahantongo Street
Pottsville, PA  17901
   *Counsel for Appellant*

David C. Gustman
Deborah H. Bornstein (argued)
Marc H. Kallish
Tina C. Mazzulla
Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, IL  60606

Stephen J. Kastenberg
Burt M. Rublin
Ballard Spahr LLP
1735 Market Street
51st Floor
Philadelphia, PA  19103-7599

Dennis R. Sheaffer
Tucker Arensberg & Swartz
111 North Front Street
P.O. Box 889
Harrisburg, PA  17108
   *Counsel for Appellee*

_____

OPINION

_____

SMITH, *Circuit Judge.*

David Roth was attempting to unload a railway tank car filled with sulfuric acid when its chemical contents exploded, spraying Roth across his face and chest and inflicting severe burns. Roth brought suit, seeking damages for his personal injuries under the common law, but the District Court held that his lawsuit was preempted by the Hazardous Materials Transportation Act ("HMTA"), 49 U.S.C. §§ 5101–5128. We agree and will therefore affirm.

I

In the early 1970s, those who transported hazardous materials through interstate commerce were forced to navigate "a patchwork of sometimes conflicting state regulations." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1112–13 (3d Cir. 1985). The prevailing regulatory regime was fragmented and, to some, incoherent. S. Rep. No. 93-1192, at 8 (1974) (explaining that "the fragmentation of regulatory power

3

among the agencies dealing with the different modes of transportation blocks a coherent approach to the problem"). At the same time, the quantity of hazardous material moving across state lines was on the increase. S. Rep. No. 93-1192, at 7 ("The amount of hazardous material being transported in the United States increases every year."). Predictably, accidents involving such materials were concomitantly on the rise. S. Rep. No. 93-1192, at 7 ("The increasing volume of dangerous products in commerce has brought with it an increasing number of accidents."). To address these concerns, the Secretary of Transportation requested greater oversight capability. *See* S. Rep. No. 93-1192, at 7.

Congress responded by enacting the HMTA in 1975. Its overriding purpose was to develop "a uniform, national scheme of regulation regarding the transportation of hazardous materials." *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 674 (D.C. Cir. 2005) (Henderson, J., concurring) (internal quotation marks omitted); *Chlorine Inst., Inc. v. Cal. Highway. Patrol*, 29 F.3d 495, 496 (9th Cir. 1994); *Colo. Pub. Utils. Comm'n v. Harmon*, 951 F.2d 1571, 1574 (10th Cir. 1991); *Cent. Jersey Power*, 772 F.2d at 1112–13; *see also* S. Rep. 93-1192, at 1 (stating that passage of the HMTA was intended to "draw[] the Federal Government's now-fragmented regulatory and enforcement power over the movement of hazardous materials in commerce into one consolidated and coordinated effort under the direction of

the Secretary of Transportation"). Congress underscored—and expanded upon—this objective fifteen years later when it amended the HMTA and found, among other things, that:

(3) many States and localities have enacted laws and regulations which vary from Federal laws and regulations pertaining to the transportation of hazardous materials, thereby creating the potential for unreasonable hazards in other jurisdictions and confounding shippers and carriers which attempt to comply with multiple and conflicting registration, permitting, routing, notification, and other regulatory requirements,

(4) because of the potential risks to life, property, and the environment posed by unintentional releases of hazardous materials, consistency in laws and regulations governing the transportation of hazardous materials is necessary and desirable,

(5) in order to achieve greater uniformity and to promote the public health, welfare, and safety at all levels, Federal standards for regulating the transportation of hazardous materials in intrastate, interstate, and foreign

5

commerce are necessary and desirable[.]

Hazardous Materials Transportation Uniform Safety Act of 1990, Pub L. No. 101-615, § 2, 104 Stat. 3244, 3245 (1990). In 2005, Congress amended the HMTA again and re-adopted these findings. Hazardous Materials Transportation Safety and Security Reauthorization Act of 2005, Pub. L. No. 109-59, § 7101, 119 Stat. 1144, 1891 (2005).

The HMTA empowers the Secretary of Transportation to "prescribe regulations for the safe transportation, including security, of hazardous materials in intrastate, interstate, and foreign commerce." 49 U.S.C. § 5103(b)(1); *see also Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 812 (D.C. Cir. 2006) (describing this delegation as a "broad mandate"). Pursuant to this authority, the Department of Transportation ("DOT") promulgated a set of rules known as the Hazardous Materials Regulations ("HMR"). 49 C.F.R. §§ 171–180.605. These regulations apply to matters of "transportation" in "commerce." 49 U.S.C. § 5103(b)(1); 49 C.F.R. § 171.1. The HMTA defines "transportation" as "the movement of property and loading, unloading, or storage incidental to the movement." 49 U.S.C. § 5102(13). "Commerce" means, *inter alia*, "trade or transportation in the jurisdiction of the United States . . . between a place in a State and a place outside of the State." 49 U.S.C. § 5102(1)(A). The scheme erected by the HMTA/HMR is thus controlling

6

during the interstate movement of hazardous materials, and also at various stages before and after said movement. *See* 49 C.F.R. § 171.1(a)–(c) (describing "pre-transportation functions," "transportation functions," and instances of "storage incidental to movement").

Where applicable, the HMR is comprehensive: it sets forth, for example, each substance or material considered to be "hazardous"; governs the transport of such material by aircraft, railcar, vessel, and motor vehicle; describes requirements for packaging, marking, labeling, declaring, and registering hazardous materials; and advances a series of training and security requirements for those who come into contact with hazardous substances. Failure to comply with these provisions can result in an array of administrative sanctions, civil penalties, and, under certain circumstances, criminal punishment. *See* 49 U.S.C. §§ 5121–24.

Sulfuric acid is a "hazardous material." 49 C.F.R. § 172.101. Accordingly, railway tank cars carrying the chemical must adhere to design specifications approved by the DOT. 49 C.F.R. § 173.242(a). Tank cars must be mounted to a railcar structure in a specified manner. 49 C.F.R. §§ 179.10–179.11. Tank car volume and weight capacity are spelled out. 49 C.F.R. § 179.13. Most tank car models must satisfy DOT standards for thermal resistance. 49 C.F.R. § 179.18. Modifications to the

design features set forth in the HMR are prohibited absent written authorization from the DOT. 49 C.F.R. §§ 179.3–179.4.

Defendant Norfalco transported sulfuric acid using model 111AW non-pressure tank cars. The HMR governs the 111AW's shape, 49 C.F.R. § 179.200-3, the thickness of the plates used to construct the car, § 179.200-6, its expansion capacity, § 179.200-14, the method for applying attachments to the tank car structure, § 179.200-19, the size, shape, and appearance of plugs used to cap tank car openings, § 179.200-21, and the presence, quantity, and application of insulating materials, § 179.200-4. Each 111AW tank car must also undergo pressure testing to ensure there is no "leakage or evidence of distress." 49 C.F.R. § 179.200-22. It is undisputed that Norfalco fully complied with the HMR requirements for model 111AW tank cars.

The HMR sets forth various fittings suitable for tank car installation. When so installed, "[g]auging devices, top loading and unloading devices, venting and air inlet devices" must be approved for use by the Association of American Railroads ("AAR"), an industry standard-setting organization. 49 C.F.R. § 179.200-16; 49 C.F.R. § 179.2 (defining "approved" under Part 179). The AAR, in turn, publishes a "Manual of Standards and Recommended Practices," one chapter of which details design and maintenance criteria for the fittings identified above. Several specifications in this chapter pertain to

8

devices installed on sulfuric acid-bearing cars. The parties agree that Norfalco's tank cars complied with AAR criteria concerning gauging devices, top loading and unloading devices, venting and air inlet devices.

Most tank cars must also be equipped with agency-approved pressure relief devices. *See* 49 C.F.R. § 179.15. Such instruments must permit "sufficient flow capacity to prevent pressure build-up in the tank." 49 C.F.R. § 179.15(a). Flow capacity requirements are set forth in the AAR Manual of Standards and Recommended Practices. 49 C.F.R. § 179.15(b). Furthermore, the HMR dictates precise technical settings according to which pressure relief devices must be reclosed following use, 49 C.F.R. § 179.15(b), and imposes testing standards to ensure that each instrument satisfies applicable criteria before it is put to use in transport, 49 C.F.R. § 179.200-23. The parties agree that Norfalco complied in full with the HMR requirements for pressure relief devices. Indeed, there is not a single provision in the HMTA or HMR with which Norfalco failed to comply.

## II

P.H. Glatfelter Company is a paper manufacturer based in York, Pennsylvania. Its manufacturing process requires large quantities of sulfuric acid—approximately 40,000 pounds per day—which it uses to bleach wood pulp. In 2004, Glatfelter purchased nearly all the sulfuric

9

acid it needed from Norfalco, North America's largest supplier of the chemical. Norfalco would then deliver the sulfuric acid by rail directly to Glatfelter's Pennsylvania mill.

Roth was employed by Glatfelter as a "chemical unloader." His primary responsibility, as his job title suggests, was to unload sulfuric acid from the tank cars sent by Norfalco. Before he could safely do so, however, Roth was required to depressurize each car. This process was simple enough: Roth explained in a deposition that he first removed a cap covering an "air inlet" located on the tank car and then opened something called the "Jamesbury valve." At this point, air began to exit the tank car through the uncapped air inlet. Roth knew the tank car was depressurized when he could no longer hear or feel air escaping from the inlet.

To unload the depressurized tank car of its chemical contents, Roth opened a second inlet into which he inserted a rod-like device called an "elbow pipe." On the opposite end of the elbow pipe, Roth attached a rubber hose, called the "acid hose." The acid hose ran to a nearby "acid storage tank." Roth had to siphon the sulfuric acid out of the tank car through the acid hose by pumping air into the tank car through the first air inlet; the incoming air pushed sulfuric acid out of the tank car through the second air inlet and into the acid hose, where it flowed into the storage tank. On average, it took approximately two hours to empty a tank car of sulfuric

10

acid.

On August 11, 2004, Roth was attempting to unload a tank car of sulfuric acid when he encountered an unidentified mechanical difficulty. Because the source of the complication was not apparent, Roth's supervisor instructed him to "deactivate" the unloading process and move on to another tank car. Roth complied, but he did not remove the elbow pipe from the partially-unloaded car. Two days later, Roth was told to detach the pipe. As he did so, acid began "flying out" of the air inlet, spraying Roth's face and chest and causing severe burns. Roth later explained that he had not attempted to depressurize the tank car before removing the elbow pipe because he believed—mistakenly, as it turned out—that the car was "already depressurized."

Roth invoked diversity jurisdiction and filed a complaint in the District Court asserting negligence, strict liability, products liability, and breach of warranty claims. His theory of the case was the stuff of basic tort law: Norfalco had a duty to design its tank cars to ensure they were safe for those who unloaded them. This duty required Norfalco to equip its cars with a safety valve that would have allowed a chemical unloader like Roth to control the rate at which sulfuric acid was discharged. In addition, Norfalco had a duty to equip its tank cars with a pressure gauge, whose presence would have alerted Roth of the need to depressurize the car before unloading it. The absence of both safety devices, according to Roth,

11

meant that Norfalco had been negligent. Roth also argued that Norfalco warranted that its cars were designed in a reasonably safe manner, that Norfalco's tank cars were ultrahazardous, and that, given the absence of a safety valve and pressure gauge, sulfuric acid could not be removed from the cars in a safe and prudent manner.

The District Court granted summary judgment in favor of Norfalco. The Court first determined that Roth's common law negligence, products liability, and breach of warranty claims are expressly preempted by the HMTA. It then held that Roth's strict liability claim, while not preempted, nonetheless failed because unloading sulfuric acid from a tank car is not an "abnormally dangerous activity." Roth appeals this decision, attacking both of the District Court's conclusions. We have jurisdiction to entertain his appeal pursuant to 28 U.S.C. § 1291.

III

We subject a grant of summary judgment to plenary review. *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 826 (3d Cir. 2011). Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is

12

'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In conducting our inquiry, we consider the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in that party's favor. *Spence v. ESAB Group, Inc.*, 623 F.3d 212, 216 (3d Cir. 2010). Here, the District Court's preemption and strict liability determinations were based on questions of law; we review those dispositions *de novo*. *Deweese v. Nat'l R.R. Passenger Corp. (Amtrak)*, 590 F.3d 239, 244 n.8 (3d Cir. 2009).

IV

The Constitution's Supremacy Clause elevates federal law above that of the states, U.S. Const. art. VI, cl. 2, providing Congress with "the power 'to preempt state legislation if it so intends,'" *Deweese*, 590 F.3d at 245 (quoting *Hi Tech Transp., LLC v. N.J. Dep't of Envtl. Prot.*, 382 F.3d 295, 302 (3d Cir. 2004)). Preemption comes in three forms: express preemption, field preemption, and implied conflict preemption. *Farina v. Nokia, Inc.*, 625 F.3d 97, 116 (3d Cir. 2010) (citing *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)). Express preemption occurs when a federal law "contains language so requiring." *Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 239 (3d Cir. 2009), *aff'd*, ---U.S.---, 131 S. Ct. 1068

13

(2011). The congressional enactment, in other words, must be explicit about its preemptive effects. *Deweese*, 590 F.3d at 247 n.10; *St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the Virgin Islands*, 218 F.3d 232, 238 (3d Cir. 2000) (explaining that express preemption "arises when there is an explicit statutory command that state law be displaced"). Field preemption arises by implication when Congress regulates a domain so pervasively that it leaves no room for state regulation. *See United States v. Locke*, 529 U.S. 89, 111 (2000). Finally, implied conflict preemption applies either where it is impossible to comply with both state and federal requirements, *Hillsborough Cnty.*, 471 U.S. at 713, or "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Kurns v. A.W. Chesterton Inc.*, 620 F.3d 392, 395–96 (3d Cir. 2010) (internal quotation marks omitted).

Section 5125 of the HMTA contains a multi-pronged preemption provision that, when applicable, displaces an array of state and local law. 49 U.S.C. § 5125. Under subsection (a)(1), a non-federal regulation is preempted if it "is not possible" to comply with both the HMTA and the non-federal requirement. Subsection (a)(2) preempts a non-federal requirement that "is an obstacle to accomplishing and carrying out . . . a regulation prescribed under [the HMTA]." Neither of these provisions is applicable to the case at hand.

14

Section 5125(b)(1) of the HMTA contains an express preemption provision, which states,

> [U]nless authorized by another law of the United States, a law, regulation, order, or other requirement of a State, political subdivision of a State, or Indian tribe about any of the following subjects, that is not substantively the same as a provision of this chapter, a regulation prescribed under this chapter, or a hazardous materials transportation security regulation or directive issued by the Secretary of Homeland Security, is preempted.

This section then sets forth five subject areas that fall within the provision's preemptive scope (*i.e.*, the "following subjects," reference above):

> (A) the designation, description, and classification of hazardous material.
>
> (B) the packing, repacking, handling, labeling, marking, and placarding of hazardous material.
>
> (C) the preparation, execution, and use of shipping documents related to hazardous material and requirements related to the number, contents, and placement of those

15

documents.

(D) the written notification, recording, and reporting of the unintentional release in transportation of hazardous material.

(E) the designing, manufacturing, fabricating, inspecting, marking, maintaining, reconditioning, repairing, or testing a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce.

49 U.S.C. § 5125(b)(1)(A)–(E).

It is obvious from the face of the statute that § 5125(b)(1) expressly preempts non-federal requirements that relate to, or are "about," the five subject areas set forth in § 5125(b)(1)(A)–(E). Our interpretive task does not end here, however, for even where an express preemption provision is at issue, we must nevertheless "identify the domain expressly pre-empted" by the provision. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996) (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992)); *see also Farina*, 625 F.3d at 118 (explaining that a reviewing court must pinpoint "the scope of the preemption provision"). We do so guided by two precepts. "First, 'the purpose of Congress is the

16

ultimate touchstone in every pre-emption case.'" *Wyeth v. Levine*, 555 U.S. 555, 129 S. Ct. 1187, 1194 (2009) (quoting *Medtronic*, 518 U.S. at 485). Second, we assume "'that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.* at 1194–95 (quoting *Medtronic*, 518 U.S. at 485). This second guiding principle is often referred to as a "presumption against preemption," *Deweese*, 590 F.3d at 246 (citing *Cipollone*, 505 U.S. at 516), and it holds even where an express preemption provision is in play, *Bruesewitz*, 561 F.3d at 240; *see also Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (stating that "Congress does not cavalierly pre-empt state-law causes of action" (internal quotation omitted)); *but see Cuomo v. Clearing House Ass'n, L.L.C.*, --- U.S. ---, 129 S. Ct. 2710, 2732 (2009) (Thomas, J., dissenting) (collecting view of four justices that the presumption against preemption does not apply when interpreting the scope of an express preemption provision). If the preemptive scope of the statute is clear, however, "the presumption against preemption can be overcome." *Bruesewitz*, 561 F.3d at 240.

We begin, then, by seeking to discern Congress' intent. The plain wording of the preemption provision is of paramount importance, for this "necessarily contains the best evidence of Congress' pre-emptive intent." *Chamber of Commerce v. Whiting*, No. 09-115, slip. op.

17

at 9 (U.S. May 26, 2011) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). We may also consider the "structure and purpose of the statute as a whole," *Medtronic*, 518 U.S. at 486 (internal quotation marks omitted), the larger regulatory scheme, *Bruesewitz*, 561 F.3d at 243, and, where uncertainty persists, the statute's legislative history, *Deweese*, 590 F.3d at 247; *Bruesewitz,* 561 F.3d at 244 (explaining that "resort to legislative history is appropriate 'when necessary to interpret ambiguous statutory text'" (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 187 n.8 (2004) (plurality opinion))).

On its face, § 5125(b)(1) is an expansive preemption provision. *Am. Chemistry Council*, 468 F.3d at 817 (describing § 5125(b)(1) as a "broader preemption [provision] with respect to state or local efforts to regulate specific, enumerated subjects"). It preempts all non-federal laws, regulations, orders, or requirements that are "not substantively the same as" corresponding federal regulations. Our threshold concern, then, is to identify the contours of the non-federal law, regulation, order, or requirement at issue in the case. Once we have done so, we must ascertain (1) whether § 5125(b)(1) applies to the non-federal law, regulation, order, or requirement we have identified, and (2) whether the non-federal requirement is "substantively the same as" the conditions imposed by federal hazardous materials law.

What, then, are the contours of the non-federal

18

law, regulation, order, or requirement invoked by Roth? Although his complaint runs through the standard catalogue of common law tort actions—negligence, strict liability, products liability, and breach of warranty—Roth is, at bottom, claiming that Norfalco had a common law duty to design a safer tank car. He alleges in his complaint, for example, that the "railroad tank cars [were] dangerous and defective because [they] did not contain components which would indicate pressure . . . or valves . . . which would prevent acid from spraying onto people . . . who were unloading" the cars. He claims that the unloading process was "ultrahazardous" because the tank cars lacked a safety valve and pressure gauge. He contends that Norfalco had a duty to "plac[e] valves . . . on the pipes to prevent acid from spraying onto [unloaders]," and to "plac[e] gauges on the car which would inform [an unloader] of the pressure in the car." And he argues that Norfalco warranted that a chemical unloader could safely remove sulfuric acid from its tank cars. The sum of these contentions, though pleaded under ostensibly distinct common law theories, is the same: Roth seeks to impose a design requirement that, if successful, would require Norfalco to install an additional safety valve and pressure gauge on each of its tank cars. *See Kurns*, 620 F.3d at 398 n.8 (focusing on the "gravamen" of the claim rather than the common law label appended to it by the plaintiffs). Roth's common law claims—including his claim of strict liability—thus constitute "non-federal requirement[s]" under the

19

HMTA. *See Riegel*, 552 U.S. at 324 (holding that a statute's "reference to a State's 'requirements' includes its common-law duties"); *Premium Mortg. Corp. v. Equifax Info. Servs., LLC*, 583 F.3d 103, 106 (2d Cir. 2009) (stating that "obligations that take the form of common-law rules" are "easily encompass[ed]" by a provision that preempts state "requirement[s]").

We next turn to whether § 5125(b)(1) applies to the design requirement claim raised by Roth. Section 5125(b)(1)(A)–(E) describes five transport-related covered subjects. The express preemption provision covers any non-federal requirement "about" one of these five covered subjects. Roth's design requirement falls squarely within the subject area set forth in § 5125(b)(1)(E): it concerns the "design[]" of a "package, container, or packaging component that is . . . qualified for use in transporting hazardous materials in commerce." Roth is, after all, attempting to impose a design requirement on a chemical tank car, which is considered a package, container, or packaging component that is approved for use in transporting sulfuric acid by rail. Design requirements of a hazardous material package, container, or packaging component are the exclusive domain of the HMTA. Roth does not dispute this point; in fact, his counsel acknowledged at oral argument that the proposed design requirement fell within § 5125(b)(1)(E).

Lastly, we ask whether the tank car design

20

requirement urged upon us is "substantively the same as" the HMR design requirements for packages, containers, or packaging components qualified for use in transporting hazardous materials in commerce. It quite clearly is not. A non-federal requirement is "not substantively the same" unless it "conforms in every significant respect to the Federal requirement." 49 C.F.R. § 107.202(d); *see also* H.R. Rep. No. 101-444, at 24 (1990) ("[I]t should be noted that states may maintain and enforce laws, regulations, rules, standards or orders that are the same as their Federal counterparts."). Roth's design requirement would impose conditions beyond those imposed by the HMR and, therefore, it does not conform in every significant respect to the federal regulatory scheme. 49 C.F.R. § 107.202(d); *see Chlorine Inst.*, 29 F.3d at 496 (concluding that state regulation was "not substantively the same as" the relevant HMR requirement when it imposed a condition not required by federal regulation).

Roth's common law claims, which seek to impose design requirements upon a package, container, or packaging component used to transport hazardous materials in commerce, are expressly preempted under the plain meaning of § 5125(b)(1). Because the text of the provision is clear, we need go no further to determine the scope of Congress' preemptive intent. Nonetheless, the structure of the HMTA, as well as the purposes underlying its enactment, lend additional support to our

21

conclusion. *See Bruesewitz*, --- U.S. ---, 131 S. Ct. at 1078–79 (looking to structure and purpose of statute to bolster conclusion regarding preemptive scope even when text was clear).

The overriding aim of the HMTA, as explained above, was to restructure a national environment in which "many States and localities ha[d] enacted laws and regulations [that] var[ied] from Federal laws and regulations pertaining to the transportation of hazardous materials, thereby . . . confounding carriers . . . attempt[ing] to comply with multiple and conflicting . . . regulatory requirements." Hazardous Materials Transportation Uniform Safety Act of 1990, Pub. L. No. 101-615, § 2, 104 Stat. 3244, 3245 (1990). To rectify this hodgepodge of jurisdictional conflicts, Congress sought to establish "a uniform, national scheme of regulation regarding the transportation of hazardous materials." *CSX Transp.*, 406 F.3d at 674 (Henderson, J., concurring). The resulting regulatory framework is detailed and comprehensive, and it devotes significant attention to, *inter alia*, the packages, containers, and packaging components that routinely move across state lines. Chemical tank cars, which serve as bulk containers for hazardous materials, are subject to their own unique set of detailed specifications. This is exactly as one would expect given the motivation underlying the HMTA; were each state or locality permitted to impose its own tank car design requirements, carriers would be

22

faced with a "patchwork" of multiple and potentially conflicting jurisdictional mandates, with resulting confusion over how to comply. *See Kurns*, 620 F.3d at 398 (holding that the Locomotive Inspection Act, 49 U.S.C. § 20701 *et seq.*, preempted state common law tort claims when Congress evinced a clear goal of uniform railroad equipment regulation, and explaining that "[i]f each state had its own standards for liability for railroad manufacturers, equipment would have to be designed so that it could be changed to fit these standards as the trains crossed state lines, or adhere to the standard of the most restrictive states").

The HMTA preemption provision was, and is, the linchpin in Congress' efforts to impose nationwide regulatory uniformity. *Harmon*, 951 F.2d at 1581 ("[I]n enacting new preemption standards, Congress expressly contemplated that the Secretary would employ his powers to achieve safety by enhancing uniformity in the regulation of hazardous materials transportation."); *see also CSX Transp.*, 406 F.3d at 674 (Henderson, J., concurring) ("It was to promote this goal of uniform safety regulation by the federal agencies that the Congress enacted the HMTA preemption provision."); *Jersey Cent. Power*, 772 F.2d at 1113 ("Congress included this [preemption] provision to preclude a multiplicity of State and local regulations and the potential for varying as well as conflicting regulations in the area of hazardous materials transportation." (internal

23

quotation marks omitted)).  Indeed, when it was initially enacted, the HMTA preemption clause contained only a general inconsistency standard—state or local "requirement[s]" were preempted if "inconsistent" with federal regulations.  Transportation Safety Act of 1974, Pub. L. 93-633, § 112, 88 Stat. 2156.  This, thought the Senate Committee on Commerce, would serve "to preclude a multiplicity of State and local regulations and the potential for varying as well as conflicting regulations in the area of hazardous materials transportation."  S. Rep. No. 93-1192, at 37.  The Committee was mistaken.  Non-federal requirements continued to proliferate over the next two decades, leading Congress to overhaul—and significantly expand—the HMTA's preemptive scope.

Today there are three separate sections in § 5125 that mandate preemption.  Two continue to operate according to a rough consistency standard.  *See* 49 U.S.C. § 5125(a)(1)–(2).  The third, upon which we focus here, preempts expressly so long as a covered subject is in play.  49 U.S.C. § 5125(b)(1).  The Secretary of Transportation is also authorized to make preemption determinations, 49 U.S.C. § 5125(d), and localities may petition for a preemption waiver in order to avoid the HMTA's preemptive sweep, 49 U.S.C. § 5125(e).

Absent from the HMTA preemption provision, however, is a savings clause exempting common law requirements from the bundle of those non-federal laws and regulations displaced by the federal scheme.  This is

24

important, for in *Riegel v. Medtronic, Inc.*, the Supreme Court held that unless there is some indication to the contrary, "reference [by a preemption clause] to a State's 'requirements' includes its common-law duties." 552 U.S. at 324. Congress may displace this default condition by tempering a preemption provision with a savings clause. *See Williamson v. Mazda Motor of Am., Inc.*, --- U.S. ---, 131 S. Ct. 1131, 1135–36 (2011); *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 868–69 (2000). Thus, in *Geier v. American Honda Motor Co., Inc.*, the Court held that state common law requirements were not preempted by a federal motor vehicle regulation that expressly preempted any non-federal safety standard "not identical to the Federal standard." 529 U.S. at 864 (quoting 15 U.S.C. § 1392(d)). The reason, said the Court, lay in the presence of a savings clause that read, "[c]ompliance with" a federal safety standard "does not exempt any person from any liability under common law." *Id.* at 868. By including such a clause, Congress manifested an intent not to displace common law claims. *Id.* In contrast, there is nothing in the HMTA to indicate that Congress did not wish to preempt state common law requirements. We are thus left with a robust preemption provision that leaves little, if any, room for non-federal regulation.

In sum, the structure and purpose of the HMTA confirms what the text of § 5125(b)(1) makes plain: the HMTA preempts state common law claims that, if

25

successful, would impose design requirements upon a package or container qualified for use in transporting hazardous materials in commerce. Each of Roth's common law claims is therefore expressly preempted. Our holding is, in this respect, more expansive than that of the District Court, which concluded that the claim for strict liability was not displaced by the HMTA. But this claim, however branded, would lead to results precluded by federal law. Thus, it is not outside § 5125(b)(1)'s preemptive scope.

Roth attempts to avoid this result by questioning the very applicability of the HMTA to the case at bar. He contends that the statute reaches only to matters of "transport" in "commerce," a limitation that does not encompass the accident at issue here. In other words, Roth claims that when a consignee such as Glatfelter (or its employee) unloads a hazardous material that has reached its final destination, the HMTA does not apply because the act of unloading is not "transport" in "commerce." And the HMTA, Roth argues, has nothing to say about such non-transport activities.

The HMTA defines "transport" as "the movement of property, and loading, unloading, or storage incidental to the movement." 49 U.S.C. § 5102(13). At the time Roth was injured, the phrase "loading, unloading, or storage incidental to the movement" was not defined. The DOT has subsequently promulgated a final rule defining this phrase. "Unloading incidental to

26

movement" is now taken to mean, *inter alia*, "emptying a hazardous material from the bulk packaging after the hazardous material has been delivered to the consignee when performed by carrier personnel or in the presence of carrier personnel."  49 C.F.R. § 171.1(c)(3) (emphasis added).  In contrast, "unloading incidental to movement" does not include

> [u]nloading of a hazardous material from a transport vehicle or a bulk packaging performed by a person employed by or working under contract to the consignee following delivery of the hazardous material by the carrier to its destination and departure from the consignee's premises of the carrier's personnel . . . .

49 C.F.R. § 171.1(d)(2).  Roth claims that he falls within this carve-out, for at the time of his injury, he was an employee of a consignee (Glatfelter) unloading sulfuric acid from a bulk packaging (the tank car) following delivery by the carrier (Norfalco) and departure of the carrier's employees.  This, according to Roth, places the circumstances surrounding his accident, and any common law claims arising therefrom, outside the regulatory scheme erected by the HMTA.

Roth's theory is creative but wrong.  In his haste to invoke the quoted portions of the HMR, Roth forgets that we need not look beyond the text of a statute unless its

27

meaning is ambiguous. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984); *Lee v. Ashcroft*, 368 F.3d 218, 222 (3d Cir. 2004). When the meaning of statutory text is plain, our inquiry is at an end. *Restrepo v. Att'y Gen. of the United States*, 617 F.3d 787, 792 (3d Cir. 2010); *Steele v. Blackman*, 236 F.3d 130, 133 (3d Cir. 2001). Here, the statute and its applicability could not be more clear. Roth seeks to impose a tank car design requirement. Section 5125(b)(1) expressly preempts any common law requirement "about" the design of a "package, container, or packaging component . . . qualified for use in transporting hazardous materials in commerce." Roth concedes that Norfalco's tank cars are containers qualified for use in transporting hazardous materials in commerce. Thus, the HMTA plainly encompasses Roth's common law claims. It is irrelevant what Roth was doing at the precise moment of his injury. This only makes sense, for it cannot be the case that the comprehensive design requirements erected by the HMTA cease to govern simply because the tank car was emptied of its contents days after its delivery. The tank car is, at all times, a container qualified for use in transporting hazardous materials. The proposed design requirement is expressly preempted.

V

For the reasons set forth above, we hold that the common law claims raised by Roth are expressly

28

preempted by the HMTA.  Accordingly, we will affirm the order of the District Court granting summary judgment in favor of Norfalco.