# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| UNITED PARCEL SERVICE, INC., d/b/a UPS REDMOND SUNRISE, | No. 83825-3-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| DEPARTMENT OF LABOR AND INDUSTRIES, | |
| Respondent. | |

BIRK, J. — United Parcel Service Inc. (UPS) challenges the findings and conclusions supporting an administrative decision that UPS committed four safety violations of the Washington Administrative Code (WAC). A UPS employee submitted a complaint to the Department of Labor and Industries (Department) about the labeling of packages potentially containing hazardous materials. After an inspection, the Department cited UPS in regard to UPS's training for responding to packages leaking unknown and potentially hazardous substances, use of personal protective equipment, responding to bloodborne pathogens, and use of biohazard labels. After a hearing, an industrial appeals judge issued a proposed decision that UPS committed these violations. The Board of Industrial Insurance Appeals (Board) adopted the proposed decision as its final order and denied review. The superior court affirmed. UPS appeals. Because the Board's findings are supported by substantial evidence, we affirm.

I

Erica Kirk worked for UPS for more than 20 years as a "hazmat designated responder." Concerns about UPS's protocols for responding to leaking packages led Kirk to submit a complaint to the Department. James Davis inspected the UPS facility on August 17, 2017 on behalf of the Department. Davis later interviewed some of the designated responders. The investigation led the Department to cite UPS for seven violations, including the four at issue here. At the hearing, the Department called Kirk, Davis, and Gabriel Toutonghi, a certified industrial hygienist in the Department's Technical Services section. UPS called Glenn Messick, UPS's local health and safety manager.

II

On appeal from a superior court decision affirming a decision by the Board, this court sits in the same position as the superior court and reviews the agency's order based on the administrative record. B & R Sales, Inc. v. Dep't of Lab. & Indus., 186 Wn. App. 367, 374, 344 P.3d 741 (2015). We accept the Board's findings of fact as true unless an aggrieved party both challenges a finding and presents argument "why specific findings are not supported by the evidence" with appropriate citations to the record. Inland Foundry Co. v. Dep't of Lab. & Indus., 106 Wn. App. 333, 340, 24 P.3d 424 (2001). "The Board's findings of fact are conclusive if they are supported by substantial evidence when viewed in light of the record as a whole." Potelco, Inc. v. Dep't of Lab. & Indus., 194 Wn. App. 428, 434, 377 P.3d 251 (2016). "Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted." Id. This court does not

reweigh the evidence. Id. Instead, the evidence is viewed in the light most favorable to the party that prevailed before the Board. Id. If substantial evidence supports the Board's factual findings, this court then decides if those findings support the Board's conclusions of law. Id.

A

In violation 1 item 1 (Item 1-1), the Department asserted a violation of WAC 296-824-30005. Under this regulation, an employer must "make sure employees are appropriately trained for their assigned roles and duties," and must "[m]ake sure" the training "adequately addresses the competencies" described in the tables appended to the regulation. WAC 296-824-30005(1)(b). The training requirements at issue concern responding to a "release," defined as "[a] spill, leak, or other type of hazardous substance discharge." WAC 296-824-099. "Hazardous substance" is defined as four categories of substances as defined in other federal and state laws as well as "[b]iological or other disease-causing agents" that could "reasonably be expected" to cause death, disease, or certain other adverse health effects when a person is exposed to the agent. WAC 296-824-099.

The Department relies on the requirements of "Table 4," which describes the competencies required of "Hazardous Materials Technicians and Hazardous Materials Specialist[s]." WAC 296-824-30005 tbl.4. Table 4 requires that these employees be trained to "use field survey instruments and equipment to classify, identify, and verify materials at the incident" and "select and use personal protective equipment (PPE) appropriate for hazardous materials technicians." Id. UPS does not dispute that it never provided the employees at issue training to use

3

field survey instruments to identify materials in an incident. Rather, it contends that the employees at issue were governed by "Table 3," which covers "First Responders at the Awareness Level and Operations Level." Under Table 3, employees are not required to be trained to use field survey instruments to identify materials in an incident, and, for selecting PPE, these employees need to be trained to "select and use [PPE] *appropriate for first responder operations level*." WAC 296-824-30005 tbl.3 (emphasis added).

The respective employee roles are defined in an earlier section of the code. UPS contends that the employees at issue should have been classified as "[f]irst responder at the operations level" under WAC 296-824-20005 tbl.1. That classification refers to employees who:

- Respond to actual or potential releases in order to protect nearby persons, property, and/or the environment from the effects of the release
- Are trained to respond defensively, without trying to stop the release
- May try to:
  - Confine the release from a safe distance
  - Keep it from spreading
  - Protect others from hazardous exposures

Id. In contrast, the Department relies on the classification described as "[h]azardous materials technician," which refers to employees who:

- Respond to releases or potential releases, with the intent of stopping the release
- Are trained to approach the point of release offensively in order to, either:
  - Plug
  - Patch
  - Stop the release using other methods

Id.

4

The relevant question is whether there was substantial evidence that the employees at issue were tasked with going beyond the duties of a "[f]irst responder at the operations level" responding only "defensively" or instead were tasked with responding "with the intent of stopping" a release and to "approach the point of release offensively" to plug, patch, or stop it. If responding offensively, then the employees were properly viewed as having the role of "[h]azardous materials technician" and were required to have the associated higher level of training.

In findings of fact 5, 6, and 7, the Board found,

5. As alleged in Item 1-1 of the corrective notice of redetermination, on August 16, 2017, UPS failed to ensure that its designated responders were appropriately trained to respond to the 8-10 leaking packages per shift that potentially exposed the employees to potentially hazardous substances by failing to train them to use instruments to identify or verify the presence of potentially hazardous substances and by failing to train them to select appropriate personal protective equipment when responding to hazardous materials in the UPS facility, including trucks and vans being unloaded and loaded at the facility, posing a risk of serious illness or death.

6. UPS knew, or had reason to know, that its designated responders were not appropriately trained to respond to leaking or spilled packages that potentially exposed employees to hazardous substances by failing to train designated responders to use instruments to identify or verify the presence of hazardous substances and by failing to train them to select appropriate personal protective equipment when responding to hazardous materials.

7. A substantial probability existed that the designated responders, including Erica Kirk, were exposed to the hazard described in Finding 5 above would be injured, and that if harm resulted, it would be serious physical harm, including the possibility of cognitive disorders, permanent kidney or liver damage, pulmonary edema, cancer, or death.

Relevant to Item 1-1, the evidence taken in the light most favorable to the Department showed the following: A UPS designated responder's duties were to make an assessment and clean up when a package leaks, breaks open, or spills. Messick agreed designated responders were tasked to "contain the spill" and "clean it up as well" when responding to a leaking package. This included cleaning up biohazards, flammable liquids, corrosive liquids, and "certain types of poisons." A designated responder contrasts with an "outside responder," which refers to outside contractors responding to spills for which designated responders did not have proper training or permission.

Kirk estimated she responded to "maybe eight to ten" packages "give or take, at least" "on a daily basis" in 2017. She estimated that "on an average maybe 40 percent of the time, give or take," she could not identify what the leaking substance was based on either the packaging, the tracking number, or some other readily available information. Kirk would not necessarily know what was in an unlabeled box until it was opened. Messick agreed that in the absence of hazard labels on the outside of a package, UPS personnel "wouldn't know the contents unless we opened the package."

UPS's "decision tree and response sheet" was its "guide" for "how to respond to and handle spills." The document used a series of questions to determine the response to a spill, and it provided specific guidance on types of hazardous materials. For responding to unlabeled packages or unknown materials, designated responders were trained that contact with unknown materials could cause burns to eyes and skin, there could be fire that produces

6

irritating or poisonous gas, contents could be poisonous if inhaled, swallowed, or contacted skin, and unknown materials could be flammable or toxic. The training indicated that in case of a "noticeable skin irritation due to fumes or vapors," the designated responders must not attempt to continue cleanup but must follow the chain of command to call for an outside responder. Neither Kirk's training nor the guide directed her to seek a second opinion through management for unlabeled boxes, though she testified that she could do so. Nowhere in the applicable response sheet did it call for designated responders to refrain from approaching unlabeled boxes containing unknown contents. Instead, the decision tree directed designated responders to handle the spill and package, in some cases where the leaking contents were unknown.

The training included that "if there is an irritating odor, smoke or visible fumes that affects the eyes, nose or throat," then an "SCBA [self-contained breathing apparatus] must be used," referring to a full face mask that provides breathable air. Kirk testified the training was to "only" don an SCBA if a designated responder encountered an irritating odor, smoke, or visible fumes that affect the eyes, nose or throat. Use of an SCBA was on a "case-by-case basis" and was an "option" in case a designated responder should "feel that [they] need to wear the SCBA." Regarding identifying inhalation hazards, Messick testified, "we train [designated responders] to look for smoking or fuming packages," to "read the labels on the outside of a package," and "look for special permit numbers." Sometimes the customer was contacted with questions about the contents of a package. Messick testified designated responders were taught to don goggles,

7

gloves, boots, and apron on "every spill," and "if [they] need to, they could don the SCBA." For unknown materials, Messick testified "if the odor of the spill is irritating, [they]'re going to don the SCBA," adding, "especially if the fumes are affecting the eyes, nose or throat." Messick then testified, "And then we have the cleanup process." Designated responders were not trained to use any field instruments to independently verify the identity of a leak from a package.

A number of materials were not allowed in UPS's system. UPS prohibited packages that are explosive, contain an inhalation hazard, or are radioactive. The prohibition on inhalation hazards referred to packages designated with a federal Department of Transportation (DOT) hazard label for inhalation hazards. Messick agreed that "products like floor finishers, wood stains, polyurethane products for finishing projects" were all shipped through UPS's system, as well as epoxy, weed killers, disinfectants, window cleaner, and motor oil. The facility at issue received materials such as Clorox, insecticides, and pesticides.

Although Kirk testified she did not respond to inhalation hazards, this was in response to questioning concerning whether she would respond to packages that were labeled as inhalation hazards. Kirk elsewhere testified she responded to materials without being able to identify them, explaining that in some cases, there was a delay in identifying a substance but it still needed to be cleaned up "immediately." Davis likewise found that designated responders were responding to clean up unlabeled waste being shipped through UPS without identifying the waste material until opening the package. Davis was not informed how designated responders would identify an unknown material in a package.

Davis testified it is possible for inhalation of some chemicals to occur where the designated responder may not visually see it or smell it in any way. Davis learned that the responders were trained not to put on the SCBA until they see smoke or encounter an irritant that affects their ability to breathe. This indicated to Davis that the designated responder was exposed to the material before they would don their SCBA. No multi gas meter to monitor the air was provided to aid in determining the level of hazard present. Davis concluded the designated responders needed "technician level" training and did not understand the potential health risks of some hazardous chemicals, were not using instruments or equipment to classify or identify the hazardous materials, and were not selecting and using appropriate PPE, such as SCBA, when going into unknown situations. Designated responders required "Table 4" training because their role was to stop the leak and clean the area when the hazard risk of the leak was unknown. Davis testified this posed a major health risk, including serious bodily injury, because the designated responders could be overcome by chemical vapors or could have a delayed reaction after exposure.

Toutonghi testified there are chemicals not prohibited by UPS that pose inhalation hazards and that are not reliably detectable by odor. Toutonghi described the "crux" of the problem as UPS's strategy of identifying hazards by relying on labels required by the DOT, which are established for road spills and not "a person standing next to that quantity in a small space like a truck or van." Toutonghi testified that some household products contain chemicals that can cause illness, some of which pose an inhalation hazard. For some chemicals, "[b]y

9

the time you recognize that you're smelling something, you could very easily be exposed over the limit that's safe." Toutonghi described the sense of smell as variable and subjective, such that relying on exposure to an "irritating" odor would not be reliable. Toutonghi testified that quantities of some products as small as a gallon could, in the back of a truck, result in concentrations in the air above the permissible exposure limit and cause health effects. Such health effects for some of the chemicals Toutonghi identified included central nervous system effects, liver and kidney damage, irritation of the respiratory tract, pulmonary edema, and death.

This evidence supports the Board's findings of fact 5, 6, and 7, because it permitted the Board to rationally find that employees responded to 8-10 leaking packages per shift in which, for packages of unknown contents, they faced a risk of inhalation hazards but were not trained to use SCBA. The evidence permitted the Board to rationally find that UPS designated responders responded to releases "offensively" to stop the release, and were required to have training under WAC 296-824-30005 tbl.4. The evidence further permitted the Board to rationally find that the designated responders were exposed to a risk of serious physical harm, including the possibility of central nervous system effects, liver and kidney damage, irritation of the respiratory tract, pulmonary edema, and death. Although finding of fact 7 refers to the risk of "cognitive disorders" and it appears that Toutonghi testified to the risk of "central nervous system effects," this slight variance from the testimony is not material to the Board's finding that designated responders faced serious health risks. The evidence likewise supports the Board's findings on the severity of injury as being a "3" on a scale of 1 to 3 and the

probability of injury as being a "1" on a scale of 1 to 3. As a result, the conclusion of violation as to Item 1-1 is also supported.

B

In violation 1 Item 2 (Item 1-2), the Department asserted a violation of WAC 296-824-60005. Under this regulation, an employer must "provide appropriate PPE" and "make sure it is used if hazards could be present." WAC 296-824-60005(1). The employer must select PPE based on "[t]he hazards and potential hazards of the site," as described in "Table 9." WAC 296-824-60005(2)(c). Under "Table 9," if "[i]nhalation hazards could be present," then, with an exception not alleged to be applicable here, the corresponding PPE is "[p]ositive-pressure (pressure-demand) self-contained breathing apparatus (SCBA)." WAC 296-824-60005 tbl.9.

In findings of fact 14, 15, and 16, the Board found,

14. As alleged in Item 1-2 of the corrective notice of redetermination, on August 16, 2017, UPS failed to ensure that employees wore self-contained breathing apparatuses (SCBA) when they encountered an average of 8-10 leaking or spilled packages per shift that contained hazardous substances that posed potential inhalation hazards that could result in serious diseases or death.

15. UPS knew, or had reason to know, that employees did not use SCBA when they encountered leaking or spilled packages that contained hazardous substances that posed potential inhalation hazards that could result in serious diseases or death.

16. A substantial probability existed that Erica Kirk and other designated responders were exposed to the hazard described in Finding 14 above would be injured, and that if harm resulted, it would be serious physical harm, including the

11

possibility of cognitive disorders, permanent kidney or liver damage, pulmonary edema, cancer, or death.

Relevant to Item 1-2, the evidence taken in the light most favorable to the Department showed the following. For responding to a package with unknown contents, designated responders were to wear PPE consisting of goggles, boots, apron, and gloves with a silver shield liner. Kirk testified this PPE policy was "not enforced" and that designated responders "[a]bsolutely" did not always wear goggles, boots, apron, and gloves when responding to unknown packages. Kirk observed employees fail to use PPE in situations where UPS's decision tree and response sheets required it.

Davis concluded employees were not using SCBA as PPE when responding to unlabeled, unidentified leaks. This was because employees were "having to have an encounter before they will put on their respiratory protection." Davis described UPS's procedure as involving "a substantial possibility for the immediate death or an immediate serious injury or illness" calling for entry "wearing a positive pressure SCBA." This is because, in Davis's interpretation of the language of the code, "inhalation hazards could be present when a designated responder is responding to an unknown package with unidentified contents." Davis explained, "[W]hen it's an unknown and you do not know what it is, then you have to assume that it's potentially hazardous. [T]herefore, you would put on your SCBA until you can determine what it is, and then you can downgrade your respiratory protection."

This evidence, along with the evidence described for Item 1-1 above, supports the Board's findings of fact 14, 15, and 16, because it permitted the Board

to rationally conclude that UPS did not train or require designated responders to use SCBA even when inhalation hazards "could be present" under WAC 296-824-60005 tbl.9, when responding to leaking packages containing unknown material. The evidence also supports the Board's findings regarding the severity of the hazard and the probability of injury. As a result, the conclusion of violation as to Item 1-2 is also supported.

C

In violation 1, item 4 (Item 1-4), the Department asserted a violation of WAC 296-823-12005(2). Chapter 296-823 WAC "provides requirements to protect employees from exposure to blood or other potentially infectious materials (OPIM) that may contain bloodborne pathogens." WAC 296-823-100. It applies if an employer has "employees with occupational exposure to blood or OPIM, even if no actual exposure incidents have occurred." Id. Under the regulation relied on by the Department, an employer must "provide training" both "[b]efore assigning tasks where occupational exposure might occur" and "[a]t least annually and within one year of the previous training." WAC 296-823-12005(2)(a)-(b).

In finding of fact 23, the Board found,

23. As alleged in Item 1-4 of the corrective notice of redetermination, on August 16, 2017, UPS failed to ensure the employees had received bloodborne pathogens training annually before assigning them to clean up potentially infectious material, which could result in employees contracting HIV [human immunodeficiency virus] or hepatitis, which may lead to long-term illness or death.

Relevant to Item 1-4, the evidence taken in the light most favorable to the Department showed the following. Davis asked the designated responders about

13

bloodborne pathogens and they were unable to provide information about the bloodborne pathogen program. Davis found that some employees had not been trained annually as required by code. For instance, at Davis's inspection in August 2017, one employee's last completed training was documented as having occurred in June 2016. Another employee had been documented as having received training in November 2016, but did not receive refresher training until January 2018. Kirk testified she did not receive as part of UPS's bloodborne pathogen training a copy of the Department's bloodborne pathogen regulation. This is a code requirement. WAC 296-823-12005(5)(a).

This evidence supports the Board's finding of fact 23 because it permitted the Board to rationally conclude that UPS had not provided training on bloodborne pathogens with the required frequency. As a result, the conclusion of violation as to Item 1-4 is also supported.

D

1

In violation 1, item 5 (Item 1-5), the Department asserted a violation of WAC 296-823-14025. Under this regulation, an employer must "attach appropriate labels to" containers "used to store, transport, or ship blood or other potentially infectious materials." WAC 296-823-14025(1)(a). A compliant label must bear a symbol associated with biohazards and be "all or mostly fluorescent orange or orange-red." WAC 296-823-14025(2)(a)-(b). The label must be attached "by string, wire, adhesive, or other method so they can't become lost or accidentally removed." WAC 296-823-14025(2)(c).

14

In findings of fact 25, 26, and 27, the Board found,

25.     As alleged in Item 1-5 of CNR 317946179, on August 16, 2017, UPS did not ensure that appropriate biohazard labels were attached to the exterior of packages or barrels used to store potentially infectious materials, including human blood, saliva, bone, and tissue, potentially exposing employees to the risk of serious illness, disease, or death.

26.     UPS knew, or had reason to know, that it did not ensure that appropriate biohazard labels were attached to the exterior of packages or barrels used to store potentially infectious materials, including human blood, saliva, bone, and tissue, potentially exposing employees to the risk of serious illness, disease, or death.

27.     A substantial probability existed that employees exposed to the hazard described in Finding 25 above would be injured, and that if harm resulted, it would be serious physical harm, including the possibility of cognitive disorders, kidney or liver disease, pulmonary edema, cancer, or death.

Relevant to Item 1-5, the evidence taken in the light most favorable to the Department showed the following. The Department attributed this violation to the "dental buckets" identified as shipments to Pristine Environmental Recycling (PER), which receives packages shipped through UPS from dental offices sending packages for recycling metals. Kirk testified that "[t]hrough the years," her UPS facility received metal containers destined for PER and "typically they have liquid in them which spills out and leaks." The liquid "has a foul putrescent odor." Other packages destined for PER were one-, three-, and five-gallon buckets containing dental waste, one of which once was "completely full of gray to black colored human teeth" and "spilled and leaked in our facility." When leaking, these shipments had a "rotting, putrescent odor" and "[t]here have been times when we're cleaning up a spill and it will cause a gag reflex." The shipments to PER

15

were "99 percent unlabeled." Occurrence of shipments destined for PER leaking was "not just once in a while" but "has been very consistent."

The shipments of dental waste contained waste amalgam and saliva. The dental amalgam contained a combination of mercury, silver, tin, and other metals used for fillings. The dental waste qualified as OPIM based on its generation during dental procedures in which tissue, teeth, waste amalgam, saliva, and blood are removed. Davis testified the tissue along with blood extracted during dental procedures meets the definition of OPIM and should be labeled. Messick testified that dental amalgam does not require a DOT hazard label when it is shipped if it is decontaminated. UPS never brought up decontamination during Davis's inspection, UPS employees did not treat the material as if it had been decontaminated, and no one asserted it was not hazardous. Toutonghi testified an odor like sewer or decaying biological material would indicate that the material was not effectively disinfected. Chemicals associated with biological decay such as putrescine and cadaverine could cause a gag reflex response.

Kirk testified there was "strictly" no direction to ever treat a leaking substance as a biohazard, because there is no procedure to identify a spilled material. If a package was not labeled but "in fact contained biohazard," there was no "specific training" but Kirk's practice was to "contact management" for a "second opinion." While a responder would treat an infectious substance as such if it were labeled, and in that case call for an outside responder, the training and the procedures never led to treating an unknown material as an infectious substance.

Davis testified UPS's response training did not provide for the identification and proper treatment of biohazards.

Kirk testified a designated responder had no way of independently verifying whether an unlabeled package with unknown contents was leaking an infectious substance. In the past, Kirk provided cleanup response to packages involving rotting human teeth and sludgy brown fluid that had the odor of sewage. Kirk described another incident in which an unmarked package was leaking, and, when opened, was found to contain a red bag marked infectious waste.

Designated responders responded to the leaking packages destined for PER by cleaning up the material and repackaging it into a holding location, still without proper labeling. UPS contracted with a company to dispose of material identified as biohazard requiring disposal. Kirk agreed that for the most part, once UPS segregated such material, non-UPS entities were contacted to pick up the material and there was not to be further interaction with it by UPS personnel.

UPS developed a response protocol specifically for packages addressed to PER, but it led back to the original decision tree calling for pH testing.[1] Designated responders were trained to use pH tape to determine whether to proceed to the corrosive liquid protocol or the flammable liquid protocol. Kirk testified pH results can be inconclusive, and for leaking PER packages "would probably default" to the flammable liquid response sheet. She would "contain the spill" and follow other procedures, but would not treat it as biohazard, infectious, or potentially infectious

---

[1] In chemistry, "pH" is a scale used to specify the acidity or basicity of an aqueous solution.

substance because the UPS decision tree and response sheet did not direct her to do so. For PER shipments, Kirk would then containerize the source package and clean up debris into a bag and tie it off. Kirk was not permitted to label the resulting package as a biohazard because it was not her responsibility to classify material nor add labels shippers had not applied.

Davis classified the designated responders responding to these leaking materials as a serious violation because of the potential exposure to bloodborne pathogen, hepatitis B or C, HIV, long-term illness, and death. Davis testified UPS refused to identify its clients shipping this material to PER, asserting it was confidential client information.

This evidence supports the Board's findings of fact 25, 26, and 27. The evidence permitted the Board to rationally find that UPS stored potentially infectious material including human blood, saliva, bone, and tissue, without labeling the material as biohazard. The Board appears to have erred in finding of fact 27 by repeating the same list of potential hazards which it found resulted from the inhalation hazards discussed in Item 1-1 and Item 1-2. However, this appears to be an oversight without a material impact because, as noted above, there was evidence that stored biohazard material similarly posed risks of bloodborne pathogen, hepatitis B or C, or HIV, as well as long-term illness and death. The evidence further supports the Board's findings on the severity of the hazard and the probability of injury. As a result, the conclusion of violation as to Item 1-5 is also supported.

2

UPS contends that enforcement of WAC 296-823-14025 is preempted to the extent it would require UPS to affix a label to an item that the shipper did not. UPS relies on a federal statute preempting any state law " 'that is not substantively the same' " as the federal requirement for hazardous materials transportation. Roth v. Norfalco LLC, 651 F.3d 367, 374 (3d Cir. 2011) (quoting 49 U.S.C. § 5125(b)(1)). The Board did not dispute UPS's assertion that it did not "ship" the potentially hazardous material, and noted federal preemption of state law regulating "shipping" of hazardous material. The Board found that UPS committed the Item 1-5 violation because WAC 296-823-14025 "also applied when an employer stores hazardous material." The Board's findings focused on UPS's identification of leaking packages as potentially containing hazards that UPS would not further handle, which were removed from transit and stored for their shippers to retrieve. UPS's own explanation of federal law is that carriers are required to abide by the shipper's original labeling of a shipment "unless they know the information to be incorrect." The federal regulations UPS cites explain, "each offeror may rely on information provided by another offeror, unless that offeror knows or, a reasonable person, acting in the circumstances and exercising reasonable care, would have knowledge that the information provided by the other offeror is incorrect." 49 C.F.R. § 171.2(b).

UPS cites no federal law that would be violated by requiring attachment of a biohazard label for worker safety in the circumstance of UPS employees encountering and removing from transit leaking packages emitting a "rotting,

putrescent odor," rotting human teeth, and sludgy brown fluid having the odor of sewage, or a bag discovered to be already labeled as infectious waste once the unmarked exterior packing was opened.  UPS does not show that this application of WAC 296-823-14025 imposes a labeling requirement that is not substantively the same as any applicable federal requirement.  49 U.S.C. § 5125(b)(1).

Affirmed.

Birk, J.

WE CONCUR:

Smith, A.C.J.          Andrus, C.J.